Filed 9/24/20  P. v. Ward CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D076348 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCD279846) |
| WAYNE HOLLIS WARD, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Amalia Meza, Judge.  Affirmed.

John L. Staley, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters and Julie L. Garland, Assistant Attorneys General, Melissa Mandel and A. Natasha Cortina, Deputy Attorneys General, for Plaintiff and Respondent.

Wayne Hollis Ward attacked his neighbor and gouged her eyes.  He was charged with three counts:  attempted mayhem (Pen. Code, §§ 203, 664), assault by means likely to produce great bodily injury (Pen. Code, § 245,

subd. (a)(4)), and making a criminal threat (Pen. Code, § 422).[1] At trial, Ward admitted he pushed the woman but denied any intent to gouge her eyes. Over objection, the trial court allowed the prosecutor to introduce evidence, pursuant to Evidence Code section 1101, subdivision (b), of two prior incidents during which Ward attacked other people by gouging their eyes. The jury convicted Ward of attempted mayhem and assault.

Ward contends the prior act evidence was erroneously admitted, unduly prejudicial, and rendered his trial unfair. Ward also contests various fines and fees the trial court imposed after it stayed a $4,800 restitution fine. We conclude the trial court did not abuse its discretion when it admitted evidence of two prior incidents of eye gouging, and any assumed error was harmless. We further conclude no prejudicial error occurred as a result of the court's imposition of the fines and fees. We therefore affirm the judgment in its entirety.

FACTS

In 2018, Nancy R. was 57 years old and five feet, three and a half inches tall. She lived in the apartment next door to Ward, who was 71 years old and six feet, seven inches tall. Ward weighed 290 pounds and described himself as "pretty strong."

During the afternoon of December 18, 2018, Nancy left her apartment to run an errand, tapping on the wall as she walked through the hallway. As she passed Ward's apartment, she sensed someone standing behind her. She turned and saw Ward, dressed only in white underwear. His eyes were big

---

[1] "Every person who unlawfully and maliciously deprives a human being of a member of his body, or disables, disfigures, or renders it useless, or cuts or disables the tongue, or puts out an eye, or slits the nose, ear, or lip, is guilty of mayhem." (Pen. Code, § 203.) Unless otherwise specified, statutory references are to the Penal Code.

and he looked angry.  He made a face, began to growl, and put up a clenched fist.  Ward grabbed Nancy's hair, punched her cheek, and threw her to the ground.  She was "twisted" on the ground, and Ward hit and kicked her.  Then he tried to gouge her eyes out, using his thumbs.  When he tried to gouge her eyes out, Ward made "weird noises" and said, " 'I'm going to kill you.' "  He pressed with his thumbs in the inner corners of her eyes so hard that Nancy urinated in her pants.  She was scared and thought he was going to kill her.  Suddenly, someone approached, and Ward got up and went back to his apartment.

David C., a commercial pest control worker, was working at the apartment building that afternoon when he heard a woman screaming for help.  Following the sound of her screams, he came upon a woman on the ground facing down, and saw a man in his underwear crouching on top of her.  The woman was protecting her face, with both of her hands crossed on top of her head.  The man's hands were around the woman's shoulder, neck, and face.  Thinking perhaps it was a medical emergency, David yelled out, asking if everything was okay.  The man stood up and returned to his apartment without saying anything.  David approached the woman.  She had cuts on her forehead, her eyes were red, and her eyelids were "blistery."  She had blood around her face on her eyes, forehead, and nose.  Nancy told David that if he had not shown up so quickly, the man could have taken her eyeballs out.

David took Nancy to the lobby to ask the security guard to call the police.  Nancy was in pain and her vision was so blurry she was unable to see.  She told the 9-1-1 operator she had been attacked by her neighbor, that he had hit her repeatedly all over her head and face, and he had tried to "pull [her] eyes out with his fingers."

A responding police officer met Nancy and David in the lobby of the apartment building. Nancy was nervous, scared, and crying. She was holding her face with both her hands. Nancy had already tried to clean the blood from her face with wet paper towels, but the officer could see that Nancy had blood coming from her eye sockets and bruising and discoloration around her eyes. Her eyes and cheeks were red, and her eyes were swollen. Nancy told the officer Ward had punched her, gotten on top of her, and tried to gouge out her eyes.

An information charged Ward with attempted mayhem (count 1, §§ 203, 664), assault by means likely to produce great bodily injury (count 2, § 245, subd. (a)(4)), and making a criminal threat (count 3, § 422). The information also alleged Ward was previously convicted of a prior serious felony (§§ 667, subd. (a)(1), 668, 1192.7, subd. (c)) and had suffered a prior strike offense (§§ 667, subd. (b)-(i), 1170.12, 668).

At trial, Nancy, David, and the responding officer testified regarding Ward's December 2018 attack on Nancy. Photographs depicting Nancy's injuries taken by the responding officer immediately after the incident were shown to the jury. The photographs showed scratches and injuries to Nancy's face, swelling around her eyes and eyelids, and scratches and severe bruising around her eyes, especially to the inside corners of her eyes. Over defense objection, the trial court allowed the prosecution to introduce evidence of two prior incidents during which Ward attacked a victim. In the two prior incidents, as in the current charged offense, the victim was smaller than Ward, lived or was present near him, and bothered and angered him by tapping or banging in close proximity to him. In all three incidents, the victims claimed Ward gouged their eyes.

A security guard from the apartment building testified he was familiar with both Ward and Nancy. The security guard had a high opinion of Ward, who was always friendly, kind, respectful, and pleasant. It appeared to the security guard that Nancy's mental health had deteriorated during the time she was living there, especially immediately before the December incident.

A property manager at the apartment building testified she was familiar with both Ward and Nancy. The property manager never had issues with Ward or received complaints about him when he was a resident there. She testified he was a "nice guy" who "seemed like a gentle giant." The property manager testified that Nancy's "behavior had changed from move-in," and that, in December 2018, Nancy began raising complaints, claiming people were coming into her room and claiming she heard noises coming from a vacant room. The property manager investigated Nancy's complaints, but Nancy was "agitated" because she felt the property manager was not trying to help her.

Ward testified in his defense at trial. He stated he had lived at that apartment for approximately 14 months. He remembered when Nancy first moved into the apartment next to him, which had been vacant for several weeks. The first night she was there, she knocked on his door at 3:00 in the morning, asking if he was smoking marijuana and claiming she could smell fumes. He denied smoking marijuana, closed the door, and went back to bed. From then on, for "approximately nine or 10 months, for three and four days at a time there was banging on the walls from her room."

On December 18, he heard knocking outside his apartment. He went to the door and saw Nancy. Fed up with her actions, he pushed her down by her face, intending "to just take her and push her down to the ground." After he pushed her, "[he] was over her" but he did not climb or lie on her. Almost

immediately he heard someone say, " 'What are you doing,' " and he "got up and went back into [his] room." He denied punching or kicking Nancy, and stated the entire incident lasted no more than 30 seconds.

On cross-examination, Ward admitted he "knew what [he] was doing when [he] threw [Nancy] to the ground" and admitted he knew he could greatly injure someone smaller than himself by doing that, but on redirect examination Ward again claimed he had no intention of hurting or blinding her, only to "rough her up a little bit" and "scare her."

The jury found Ward guilty on count 1, attempted mayhem (§§ 664, 203), and count 2, assault by means likely to produce great bodily injury (§ 245, subd. (a)(4)). The jury found Ward not guilty on count 3, making a criminal threat (§ 422).

Prior to sentencing, Ward admitted the serious felony prior and strike prior.

At sentencing, the trial court declined to exercise its discretion to strike the prior serious felony and prior strike and sentenced Ward to a term of 13 years, comprised of the upper term of four years on count 2, doubled because of the strike prior, for a total term of eight years on count 2, plus an additional five years for the serious felony prior. The trial court imposed and stayed an eight-year term on count 1 (§ 654). The trial court also revoked probation in a separate case (SDC271670) and imposed an additional two years in that case, for a total term of 15 years in prison.

The trial court also imposed various fines and fees discussed in more detail *post*.

6

## DISCUSSION

### I.

*Evidence of Prior Misconduct Under Section 1101*

A. *Additional Factual Background*

    1. *Motion to Admit Evidence*

Prior to trial, the prosecutor moved to admit evidence of two prior incidents of eye gouging—one occurring in 2014 and one in 2017—as evidence of intent, common plan, or lack of mistake in the current case. To address the defendant's concern that such evidence could be misconstrued as propensity evidence, the People noted the court could provide a limiting instruction directing the jury to consider the evidence only for the specified limited purposes, and not as evidence of the defendant's propensity to commit the crime.

Ward opposed admitting such evidence, arguing it would be prejudicial but not probative, and further arguing that the jury would consider the evidence as propensity evidence and would not be able to follow a limiting instruction.

The trial court conducted a hearing of the proposed evidence to determine whether the events were sufficiently similar to warrant admission for purposes of intent, common plan, or lack of mistake, and to assess the potential prejudicial impact of the evidence. (Evid. Code, § 402.)

J.R. testified that in February 2014, his neighbor, a seven-foot-tall man, attacked him in the hallway as he was unlocking his apartment door, tackled him to the ground, and pressed his fingers into his eyes, blinding him permanently. He stated the incident occurred without provocation, except on one prior occasion, the tall man had told J.R. to " 'stop knocking on [his] wall.' " J.R. is approximately five feet, four inches tall.

7

A sheriff's deputy testified that, in April 2017, when he was working in the San Diego Central Jail, he received a call reporting that medical attention was required in the cell that Ward shared with inmate J.D. When the deputy responded, he found J.D. trembling. J.D. reported that Ward had hit him and tried to gouge out his eyes. The deputy separated the men. He observed that J.D.'s eyes were swollen and red; J.D. had a large open abrasion on his right eye and scratch marks around his eyelids. The deputy also observed visible injuries on Ward's hands. Ward told the deputy he had "fucked [J.D.] up" and told him to "get [J.D.] out of his cell." J.D. was five feet, eight inches tall, with a slight build.

The prosecutor argued these incidents should be admitted to establish Ward's intent, the existence of a common plan, and lack of mistake. The prosecution argued admitting the evidence to establish Ward's intent to commit mayhem was particularly important in light of the anticipated defense theory that the victim had mental health issues (and therefore was not a credible witness). The prosecutor further argued this was "a very specific m.o.," as Ward had previously tried to gouge out two other people's eyes in circumstances quite similar to the present case. The prosecutor also argued the evidence was more probative than prejudicial and should be admitted over defense objection.

Ward argued propensity evidence was generally inadmissible and allowing testimony regarding these incidents would only encourage the jury to convict him on the inappropriate assumption that he had done similar things before, so he must have done it here. Ward further argued the evidence of the prior incidents was not substantially probative on any particular issue in the case, and it was highly prejudicial.

The trial court granted the prosecution's request to admit evidence of the prior incidents and indicated it would give a limiting instruction. In considering whether the evidence should be admitted under Evidence Code section 352, the trial court found that the prior incidents were no more inflammatory than the pending charges, as the acts were similar in that all involved causing injury to the alleged victims' eyes. The court further found the incidents were fairly recent, noted the prosecutor did not intend to admit evidence of any prior punishment associated with the incidents, and found the testimony would not take undue time. On balance, the trial court concluded that the testimony was not precluded from admission under Evidence Code section 352. The court found the evidence was probative of the issue of intent, as attempted mayhem is a specific intent crime, and there were allegations that the complaining witness suffered from mental health issues, may have been taking prescribed medication at the time, and the witness's credibility would be challenged. The trial court further found the probative value of the evidence outweighed the potential for prejudice, especially when a limiting instruction would be given. The court also found the evidence was admissible to show Ward's actions were not the result of mistake or accident, and his conduct was part of a plan or scheme to commit the alleged offense.

2. *Evidence Adduced at Trial*

a. *2014 Incident*

J.R. is five feet, four inches tall. In 2014, Ward lived across the hall from him. Ward had previously accused him of knocking on his wall, which J.R. denied doing. One day, as J.R. was entering his apartment, Ward attacked him suddenly from behind. Ward tackled him to the ground and stuck his fingers in J.R.'s eyes. J.R.'s eyes burned as he struggled to escape

9

from Ward, who had his leg over him.  J.R. eventually escaped but was unable to see.  He was permanently blinded as a result of Ward's attack.

Detectives investigating J.R.'s assault identified Ward as the suspected perpetrator of the assault.

b.  *Ward's Testimony Regarding the 2014 Incident*

Ward acknowledged the incident with J.R. in 2014.  Ward heard a banging on the wall and exited his apartment to see who it was.  He saw J.R. outside and, annoyed by his behavior, asked him "What the F are you banging on my wall for?"  Ward claimed J.R. then pushed or elbowed past him, Ward pushed back, and then J.R. "went off."  Ward used his height advantage to hold J.R. back as J.R. hit, kicked, and spit at Ward.  Then Ward "just went for his face" using his hands.  He had no intention to do so, but he pushed J.R. in the eyes until he stopped struggling.  Ward then backed away from him and went back into his room.

c.  *2017 Incident*

A deputy with the San Diego Sheriff's Department testified that, in 2017, he was on duty in the central jail and responded to a call reporting a medical emergency in a cell shared by Ward and J.D.  J.D. was approximately five feet, eight or nine inches tall, and had a slight build.  When the deputy entered the cell, Ward was seated on the lower bunk, and J.D. was sitting on the floor.  Ward was calm and quiet when the deputy entered; Ward told the deputy he had "fucked up" J.D. and told the deputy to get him out of the cell.  J.D., who was visibly shaking, crawled out of the cell.  J.D. told the deputy that Ward had hit him multiple times and tried to gouge out his eyes.  When J.D. removed his hands from his face, the deputy could see J.D. had injuries to his face, including an open wound above his right eye, swelling and redness to the eyes, and multiple small scratches around his

10

eyes and eyelids. The injuries were consistent with J.D.'s description of the incident. The deputy also inspected Ward and saw that Ward had small cuts on his hand, and his hands were swollen.

### d. *Ward's Testimony Regarding the 2017 Incident*

In 2017, when Ward was in custody in the San Diego Central Jail, he shared a cell with J.D. J.D., who had the lower bunk, and Ward, who had the top bunk, "had a little fight" one day after J.D. hit Ward's bunk. Ward became irritated and fed up after J.D. had hit his bunk several days in a row. The first day, Ward did not say anything. The second day, Ward warned him not to hit his bunk again. This day, when J.D. hit his bunk again, Ward "c[a]me at him." Ward threw the first punch and J.D. punched back. Altogether, J.D. punched Ward two or three times, while Ward punched J.D. four or five times. Then J.D. cowered and backed up; Ward stopped attacking and called the security tower.

### B. *Applicable Law*

Section 203 defines the offense of simple mayhem: "Every person who unlawfully and maliciously deprives a human being of a member of his body, or disables, disfigures, or renders it useless, or cuts or disables the tongue, or puts out an eye, or slits the nose, ear, or lip, is guilty of mayhem." "[A]s used in section 203 the word 'maliciously' 'imports an intent to vex, annoy, or injure another person, or an intent to do a wrongful act.' " (*People v. Santana* (2013) 56 Cal.4th 999, 1007; see CALCRIM No. 801 ["Someone acts maliciously when he or she intentionally does a wrongful act or when he or she acts with the unlawful intent to annoy or injure someone else."].) "An attempt to commit a crime requires a specific intent to commit the crime and a direct but ineffectual act done toward its commission." (*People v. Kipp* (1998) 18 Cal.4th 349, 376 (*Kipp*); see § 21a; CALCRIM No. 460.)

11

" 'Evidence Code section 1101, subdivision (a) sets forth the " 'strongly entrenched' " rule that propensity evidence is not admissible to prove a defendant's conduct on a specific occasion.' [Citation.] 'At the same time, "other crimes" evidence is admissible under Evidence Code section 1101, subdivision (b) "when offered as evidence of a defendant's motive, common scheme or plan, preparation, intent, knowledge, identity, or absence of mistake or accident in the charged crimes." ' " (*People v. Erskine* (2019) 7 Cal.5th 279, 295 (*Erskine*).)

The admissibility of evidence under Evidence Code section 1101, subdivision (b) depends on the degree of similarity between the uncharged act and the charged offense. (*Erskine, supra*, 7 Cal.5th at p. 295; see *Kipp*, *supra*, 18 Cal.4th at p. 369 ["Evidence of uncharged crimes is admissible to prove identity, common design or plan, or intent only if the charged and uncharged crimes are sufficiently similar to support a rational inference of identity, common design or plan, or intent."].)[2]

If the trial court determines the evidence is relevant and admissible under Evidence Code section 1101, it must next "proceed to examine whether the probative value of the evidence of defendant's uncharged offenses is 'substantially outweighed by the probability that its admission [would] . . . create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury.' (Evid. Code, § 352.)" (*People v. Ewoldt* (1994) 7 Cal.4th 380, 404 (*Ewoldt*).)

"We review for abuse of discretion a trial court's rulings on relevance and admission or exclusion of evidence under Evidence Code sections 1101 and 352." (*People v. Fuiava* (2012) 53 Cal.4th 622, 667-668.) "A court abuses

_____

[2] We discuss the varying levels of similarity which are required, depending on what the evidence is offered to prove, further *post*.

its discretion when its ruling 'falls outside the bounds of reason.' " (*Kipp*, *supra*, 18 Cal.4th at p. 371.)

C. *Analysis*

Ward contends the two prior assaults were erroneously admitted because they had only marginal relevance and were more prejudicial than probative. We disagree. Ward's assaults on J.R. and J.D. were relevant to prove his intent to commit mayhem, the existence of a common plan or scheme, and the absence of mistake.

"The least degree of similarity (between the uncharged act and the charged offense) is required in order to prove intent." (*Ewoldt*, *supra*, 7 Cal.4th at p. 402.) This standard is met here. In each instance, Ward was annoyed and fed up with the victim's actions in disrupting him (by knocking or banging on his wall or on his bunk), he deliberately directed his anger toward a victim who was at a relative disadvantage compared to Ward's strength or size, and he made a direct, targeted attack on the victim's eyes. " 'A jury may infer a defendant's specific intent from the circumstances attending the act, the manner in which it is done, and the means used, among other factors.' [Citation.] '[E]vidence of a "controlled and directed" attack or an attack of "focused or limited scope" may provide substantial evidence of' a specific intent to maim." (*People v. Szadziewicz* (2008) 161 Cal.App.4th 823, 831 [discussing specific intent requirement for aggravated mayhem under § 205], disapproved on another ground in *People v. Dalton* (2019) 7 Cal.5th 166, 214.) The circumstances surrounding Ward's attacks, and the methods used, are sufficiently similar to support an inference that Ward harbored the same intent—to seriously injure the victim's eyes—in each instance. (*Ewoldt*, *supra*, 7 Cal.4th at p. 402 [to be admissible to prove intent, the uncharged misconduct need only be

13

"sufficiently similar [to the charged offense] to support the inference that the defendant ' "probably harbor[ed] the same [or similar] intent in each instance." ' "]; accord *People v. Lindberg* (2008) 45 Cal.4th 1, 23 (*Lindberg*).)[3]

The evidence regarding the prior offenses was important to help prove Ward's intent given the attacks regarding the victim's credibility in this case, based on her apparent mental health issues, and Ward's own testimony minimizing his conduct during all the offenses. Specifically in this case, Ward claimed that he was merely trying to push the victim down, and he had no intent to harm or blind her. Similarly, he argued he never intended to gouge the prior victims' eyes, stating with respect to the 2014 incident, "I had no intention of doing it, but I found myself with my fingers around the top of his face and I pushed him in the eyes." Through these defense theories, Ward put his intent directly at issue in this case, and the prior incidents were admissible to rebut his claim that he did not intend to maim the victim.[4]

"Greater similarity is required to prove the existence of a common design or plan." (*People v. Leon* (2015) 61 Cal.4th 569, 598 (*Leon*).) To be

---

[3] Ward identifies some differences among the crimes, noting the incidents occurred in different locations and involved different victims. While there are some differences between the prior incidents and this one, the noted differences are not sufficiently material to show the court erred in admitting the evidence under Evidence Code section 1101, subdivision (b).

[4] In his reply brief, Ward argues the prior assaults "may have been admissible to prove . . . identity" if that was in dispute, but they were not admissible to prove intent because proving "specific intent to blind someone" requires more "commonality" with the prior incidents. Contrary to Ward's suggestion, a *lesser* degree of similarity is required to prove intent. (*Erskine*, *supra*, 7 Cal.5th at p. 295 [" 'The least degree of similarity . . . is required in order to prove intent . . . .' . . . By contrast, a higher degree of similarity is required to prove common design or plan, and the highest degree of similarity is required to prove identity." ' "].)

14

relevant on the issue of common design or plan, the charged and uncharged acts must share "common features [that] indicate the existence of a plan rather than a series of similar spontaneous acts, but the plan thus revealed need not be distinctive or unusual." (*Ewoldt*, *supra*, 7 Cal.4th at p. 403.) The prior 2014 and 2017 incidents were also relevant for purposes of establishing a common design or plan. On each occasion, Ward approached a lone individual who had upset or annoyed him (by either knocking on his wall or on his bunk), the targeted individual was much smaller than Ward, and Ward attacked each victim in an unusual way—by overpowering the victim and using his hands to gouge the victim's eyes. To be admissible, "[t]hese common features need not be unique or nearly unique; 'features of substantial but lesser distinctiveness may yield a distinctive combination when considered together.' " (*Leon*, *supra*, at p. 598.) Here, where Ward committed similar distinctive acts of misconduct against similar victims under similar circumstances, the common features were sufficiently similar to the charged crime to show that Ward acted with a common plan.

Evidence regarding the prior incidents was also relevant to rebut any claim of accident or inadvertence. Ward claimed he merely meant to push the victims. With respect to this crime, Ward further claimed he merely wanted to "rough . . . up" the victim and just "scare her." The prior offenses were admissible to show Ward acted intentionally rather than by accident, mistake, or inadvertence as implied by his testimony. (See *People v. Cortes* (2011) 192 Cal.App.4th 873, 916 [prior fights were admissible to support "an

15

inference that defendant did not act accidentally, inadvertently, in good faith or in self-defense when he attacked the victim"].)[5]

We also conclude the trial court did not abuse its discretion by ruling that the probative value of the challenged evidence was "not outweighed by the prejudice in this case" under Evidence Code section 352. As we have concluded, the prior assaults were probative in particular on the issue of Ward's intent in attempting to maim the victim in this case by gouging her eyes. The prior incidents were not remote, occurring approximately one and four years, respectively, before the present offense. (See *People v. Zepeda* (2001) 87 Cal.App.4th 1183, 1212 [evidence of prior incident that occurred "about five years before the current shooting" had probative value].) "The fact that the evidence of the prior incident had an independent source from the evidence of the charged offense increased its probative value." (*Ibid*.) Further, the testimony regarding the prior incidents was relatively brief, such that there was no undue consumption of time or risk that the jury would be confused.

Ward claims the prior assaults were unduly inflammatory and prejudicial, and that "[n]othing could be more prejudicial than the fact that [he] actually blinded [J.R.]" We agree gouging someone's eyes and causing

---

[5] Ward states he did not raise mistake as a defense, but evidence of other offenses is admissible when relevant to show absence of mistake *or* accident. (*People v. Whisenhunt* (2008) 44 Cal.4th 174, 204.) " 'One sense [of the word "accident"] comes into play when the defendant admits performing an act but claims that he or she did so with innocent intent.' " (*People v. Spector* (2011) 194 Cal.App.4th 1335, 1374.) The prior assaults by Ward were relevant for this purpose. Moreover, by pleading not guilty, Ward placed all the elements of the charged offenses in dispute at trial. (*Lindberg, supra*, 45 Cal.4th at p. 23.) Even if Ward did not expressly assert he acted by mistake, the prior assaults helped establish the requisite intent for the charged crimes.

16

permanent blindness is egregious, but Ward's actions in this case were equally shocking.  Ward, an individual weighing 290 pounds and standing six feet, seven inches tall, pushed his thumbs directly into the inner corners of the victim's eyes—pressing so hard that she urinated in her pants, telling her he was going to kill her, and repeatedly kicking and punching her. Ward's attack here was ultimately interrupted by a third party who came down the hallway.  Although the victim here was not blinded like one of the prior victims, this fortuity does not make Ward's actions any less egregious. "The prejudice which exclusion of evidence under Evidence Code section 352 is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence." (*People v. Karis* (1988) 46 Cal.3d 612, 638.)  Although damaging, the probative value of Ward's prior offenses was not substantially outweighed by the probability that its admission would create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury.  (Evid. Code, § 352.)

Ward contends it was "inevitable the jury would use the prior assaults to establish appellant's propensity for violent behavior."  However, this misconstrues the purpose for admitting the evidence.  When prior misconduct is admitted to show defendant's intent, " '[t]he inference to be drawn is not that the actor is *disposed* to commit such acts; instead, the inference to be drawn is that, in light of the first event, the actor, at the time of the second event, must have had the intent attributed to him by the prosecution.' " (*People v. Rocha* (2013) 221 Cal.App.4th 1385, 1394.)  The court's limiting instruction—admonishing the jury not to "conclude from this evidence that the defendant has a bad character or is disposed to commit crime"—further minimized any potential prejudice to Ward.  (*People v. Rogers* (2013) 57 Cal.4th 296, 331-332 (*Rogers*); *People v. Ghebretensae* (2013)

17

222 Cal.App.4th 741, 755 [rejecting appellant's prejudice argument where limiting instruction precluded jurors from using prior crimes evidence to show propensity to commit charged offense].) We presume the jury understood and followed the instruction. (*People v. Cage* (2015) 62 Cal.4th 256, 275.)

Even assuming the trial court erred in admitting evidence of the uncharged incidents, any error was harmless. (*People v. Watson* (1956) 46 Cal.2d 818, 836 [error is reversable if there is a reasonable probability that a result more favorable to defendant would have been reached in absence of error]; *People v. Felix* (2019) 41 Cal.App.5th 177, 187 [applying *Watson* harmless error test to consideration of evidence pursuant to Evid. Code, §§ 1101, 352].) Immediately after the incident, the victim spontaneously told the third-party witness that if he had not intervened so quickly, Ward would have taken her eyeballs out. She told the 9-1-1 operator Ward tried to "pull [her] eyes out with his fingers." She similarly told the responding officer Ward had tried to gouge out her eyes. The responding officer reported he saw blood coming from her eye sockets and bruising and discoloration around her eyes. At trial, she described to the jury how Ward pushed his thumbs into her eye sockets so hard she urinated. Photographs depicting the injuries to the victim's eyes were shown to the jury, corroborating her testimony. Altogether the evidence overwhelmingly supported the inference that Ward harbored the requisite intent to commit mayhem when he used his thumbs to forcefully press on the victim's eyes in anger and frustration. In light of the evidence, it is not reasonably probable Ward would have obtained a more favorable result if the jury did not hear evidence of the 2014 and 2017 incidents.

We further reject Ward's claim that admission of the evidence violated his federal due process rights. Ward states that he did not receive a fair trial because "the jury was prejudiced by evidence of past, violent assaults having little, if any, relevance to the charged offenses." We have already rejected Ward's claim that the uncharged incidents were not relevant to the charged offenses. "Because the evidence was material, probative, and admitted under Evidence Code section 1101[, subdivision] (b) on the legitimate issue of intent, defendant's due process right to a fair trial was not transgressed by the admission of such evidence." (*Rogers*, *supra*, 57 Cal.4th at p. 332.)

II.

*Fines and Fees*

At sentencing, defense counsel asked the court to stay imposition of the restitution fines "and the other costs in this case" based on his inability to pay them, pursuant to *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*). The trial court imposed but stayed a restitution fine of $4,800. (Pen. Code, § 1202.4.) After further discussion with the probation officer and the prosecutor, defense counsel agreed the court security fee, criminal conviction assessment fee, and criminal justice administration fee are mandatory. The court imposed a court security fee of $80 (Pen. Code, § 1465.8), a criminal conviction assessment fee of $60 (Gov. Code, § 70373) and a criminal justice administration fee of $154 (Gov. Code, § 29550.1). Defense counsel made no objection. Because the instant case served as the basis for Ward's probation revocation in a separate case (SCD27167), the court also sentenced him in that case, including imposing an "unpaid restitution fine previously imposed in the amount of $300. Additional restitution fines in the amount of $300 to be stayed and remain so unless defendant's supervision is revoked.

19

Probation revocation fee previously stayed in the amount of $300 is imposed." Defense counsel made no objection.

Ward now contends the trial court erred by not staying all the fines and fees. He argues that, if he was indigent for the purpose of paying the $4,800 restitution fine, then he was likewise indigent for the purpose of paying the remaining fines. He contends that any possibility he may earn wages while imprisoned is remote and speculative, and contends, relying on *Dueñas*, that due process of law requires the trial court to "hold[] an ability to pay hearing and conclude[] that the defendant has the present ability to pay the restitution fine." (*Dueñas, supra*, 30 Cal.App.5th at p. 1164.)

*Dueñas* relied on due process principles to require an ability to pay hearing before a trial court may impose certain mandatory fees. (*Dueñas, supra*, 30 Cal.App.5th at p. 1164.) It further held that "although Penal Code section 1202.4 bars consideration of a defendant's ability to pay unless the judge is considering increasing the fee over the statutory minimum, the execution of any restitution fine imposed under this statute must be stayed unless and until the trial court holds an ability to pay hearing and concludes that the defendant has the present ability to pay the restitution fine." (*Dueñas, supra*, at p. 1164.)

Some courts have disagreed with *Dueñas*'s reliance on due process principles. (See, e.g., *People v. Hicks* (2019) 40 Cal.App.5th 320, 326, review granted Nov. 26, 2019, S258946; *People v. Kopp* (2019) 38 Cal.App.5th 47, 94, 96 (*Kopp*), review granted Nov. 13, 2019, S257844.)[6] We need not address

---

[6]    In *Kopp*, our Supreme Court identified the following issues for review: "(1) Must a court consider a defendant's ability to pay before imposing or executing fines, fees, and assessments?  (2) If so, which party bears the burden of proof regarding defendant's inability to pay?"

20

these areas of disagreement to resolve this appeal, because we conclude Ward forfeited his claim and any assumed error was harmless in any event.

Ordinarily, a defendant who fails to object to the imposition of a fee or fine in the trial court may not raise a claim pertaining to that charge on appeal. (See, e.g., *People v. Aguilar* (2015) 60 Cal.4th 862, 864 [appellate forfeiture rule applies to probation fines and attorney fees imposed at sentencing]; *People v. Trujillo* (2015) 60 Cal.4th 850, 853-854 [applying the forfeiture rule to an unpreserved claim regarding probation-related fees and defendant's inability to pay them]; *People v. McCullough* (2013) 56 Cal.4th 589, 596-598 [defendant forfeits appellate challenge to the sufficiency of evidence supporting imposition of a booking fee if objection not made in the trial court]; *People v. Avila* (2009) 46 Cal.4th 680, 729 [forfeiture rule applies to defendant's claim that restitution fine amounted to an unauthorized sentence based on his inability to pay]; *People v. Nelson* (2011) 51 Cal.4th 198, 227 [claim that trial court erroneously failed to consider ability to pay a restitution fine forfeited by the failure to object].) Here, Ward asked the court to stay imposition of the restitution fines "and the other costs in this case" based on his inability to pay them. In response, the trial court stayed imposition of a restitution fine. But after discussion among the prosecution, defense, and probation office, the defense agreed that other fees and fines were mandatory. The defendant has the burden of proving an inability to pay (*Kopp, supra*, 38 Cal.App.5th at p. 96, review granted) and, here, Ward did not object when the trial court imposed a court security fee, criminal conviction assessment fee, and criminal justice administration fee in the present case, as well as a restitution fine and probation revocation fee from a prior case. Under the circumstances, we conclude Ward forfeited any claim that the trial court erred by imposing these particular fines and fees. (See,

21

e.g., *People v. Gutierrez* (2019) 35 Cal.App.5th 1027, 1033 [concluding defendant forfeited *Dueñas* claim by failing to object to the trial court's imposition of fines and fees].)[7]

Even assuming the claim was properly preserved, we conclude any alleged error was harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18, 24; *People v. Jones* (2019) 36 Cal.App.5th 1028, 1035 [applying *Chapman* standard of harmless error analysis to *Dueñas* error].) In assessing whether a defendant has the ability to pay, courts may consider defendant's present and future ability to pay. (See *Kopp, supra,* 38 Cal.App.5th at p. 96, review granted.) The probation report indicates that Ward has received a monthly social security payment of $1070. Ward also may be able to earn additional wages in prison. (See *People v. Hennessey* (1995) 37 Cal.App.4th 1830, 1837 [ability to pay includes defendant's ability to obtain prison wages]; *Jones, supra,* at p. 1035 ["Wages in California prisons currently range from $12 to $56 a month. [Citations.] And half of any wages earned (along with half of any deposits made into his trust account) are deducted to pay any outstanding restitution fine."].) "In our view, this forecloses a meritorious inability to pay argument." (*Jones, supra,* at p. 1035; see also *People v. Johnson* (2019) 35 Cal.App.5th 134, 139 ["The idea that [defendant] cannot afford to pay $370 while serving an eight-year prison sentence is unsustainable."].) We thus conclude any assumed error in imposing the specified fines and fees in this case was harmless.

---

[7] Ward claims the trial court concluded he was indigent. While the trial court agreed to stay the restitution fee of $4,800, we do not agree that this ruling is tantamount to a determination that Ward is unable to pay the significantly smaller fines that the trial court imposed. Rather, it indicates that the trial court considered Ward's ability to pay and reduced Ward's financial burden by staying some, but not all, of the fees and fines.

DISPOSITION

The judgment is affirmed.


                                                    GUERRERO, J.

WE CONCUR:



BENKE, Acting P. J.



O'ROURKE, J.